**SHAW, Banking Com'r, v. WHITE.**

No. 2411.

Court of Civil Appeals of Texas. Beaumont.

June 15, 1933.

Cousins & Bell, of Beaumont, for appellant.

Shivers, Baker & Shivers, of Port Arthur, for appellee.

O'QUINN, Justice.

This is an appeal from a judgment of the county court at law of Jefferson county, wherein James Shaw, banking commissioner of the state of Texas, as the statutory receiver and liquidator of the Gulf Bank & Trust Company, a failed state bank, sued Fred A. White to recover on four promissory notes executed by said White, payable to the order of Nicholas P. Nicholls, each for the sum of $50, bearing interest from maturity at the rate of 10 per cent. per annum, dated June 20, 1930, and due one month, two months, four months, and eight months after date, respectively.

Appellee, White, answered pleading failure of consideration for the execution of the notes, and fraud in the procurement of their execution; he also pleaded that the failed bank, which appellant, Shaw, was liquidating, had full knowledge of the fraud, and that through its active vice president was a party to the accomplishment of the fraud.

The case was tried to the court without a jury, and judgment rendered in favor of appellee canceling said notes, and discharging him from liability.

Briefly the undisputed facts show that Nicholas P. Nicholls was the agent of the International Guaranty Thrift Syndicate of Denver, Colo., which had a local office at Port Arthur, Tex., of which said Nicholas P. Nicholls was manager. The International Guaranty Thrift Syndicate (which will hereinafter be referred to as "the syndicate") was a kind of building and loan institution, loaning money and taking liens for security on real estate. Through its agent and local manager, Nicholas P. Nicholls, it opened an office at Port Arthur and sold its thrift bonds to the public. Purchasers of the bonds paid either cash, or part cash and part in notes, or all notes. The local organization had what was denominated a "Board of Governors"; this was composed of selected purchasers of thrift bonds. The bank in question was the banking institution of the syndicate, and it carried its active vice president, Mr. T. E. Halsell, on its reference list. Nicholas P. Nicholls solicited appellee to purchase a thrift bond, and stated to him in great detail the method of operation, and told appellee that for every $1,000 worth of bonds sold $10 in cash would be deposited in the bank to the credit of the board of governors, and that at that time there was deposited to the credit of said fund some $700 in cash; that, if appellee purchased a $5,000 bond, he would have to pay $200 in cash or execute his notes for that amount; this would be the down, or first, payment. Nicholls said he had appointed a board of governors (composed of local members) who were to co-operate in the sale of thrift bonds to the extent that they would recommend the syndicate as a sound and solvent institution, doing a legal business, and not a fake, and that every time a bond was sold there would be deposited in the bank the sum of $10 in cash for each $1,000 worth of bonds sold, to the credit of the board of governors, and that, if he (appellee) bought a bond, he would be placed on the board of governors and would be entitled to his pro rata share of said fund. Appellee informed Nicholls that he would not pay any cash if he bought a bond, but would execute his notes for $200 only on the condition that he would get a credit of $200 on the bond out of the board of governors' fund, that he would not pay any money to liquidate the notes, and that, if the board of governors' fund would not liquidate the notes, he would not execute them. Before agreeing to purchase a bond, appellee went to see T. E. Halsell, the active vice president of the bank, with whom he was well acquainted, and to whom Nicholls had referred him, and Halsell told appellee that he (Halsell) was thoroughly familiar with the methods of the proposed bond sales by the syndicate and its method of doing business, and, when asked the direct question by appellee whether the syndicate then had $700 in cash on deposit in the bank to the credit of the board of governors' fund to be used as credits on bonds purchased by members of the board of governors, answered that such deposit was then in the bank. Halsell also told appellee that if he (appellee) executed his notes the bank would at once buy them. After this conversation with the officer of the bank, appellee had another conversation with Nicholls in which he again told Nicholls that

he would not pay out any money on notes executed in payment for a bond, and Nicholls repeated to him that, if he executed the notes, they would be liquidated out of the board of governors' fund. After this appellee again called on Halsell, vice president of the bank, and told him of the conversation with and the statement of Nicholls, and that he (appellee) had agreed with Nicholls to buy an installment bond and to execute his notes for $200, but that he would not pay the notes in cash, but they were to be paid out of the board of governors' fund, and that the bank as transferee of the notes would have to look to the board of governors' fund for the payment of the notes if it bought them. At this time Halsell again stated to appellee that he was familiar with the manner in which the syndicate did business, and that the bank handled a number of other notes for the syndicate on the same basis by giving the syndicate cash for the notes, and depositing $10 in cash out of every $1,000 of bonds sold into the board of governors' fund, and that that was the usual manner in which the bank handled the syndicate's business, and that cash to the amount of about $700 was then on deposit in the bank to the credit of the board of governors' fund, and agreed that, if appellee bought the bond and executed his notes for the $200, and the notes were transferred to the bank, it would look to the board of governors' fund for the money to pay said notes; that that was the way the board of governors' fund was handled; that they were not paying said fund out to any one where there were any notes executed by them. Both Nicholls, acting for the syndicate, and Halsell, acting for the bank, told appellee that the funds accruing to the credit of the board of governors' fund were more than ample to take care of such matters, and that his (appellee's) pro rata share of said fund as a member of said board of governors would be ample to take care of the notes and payments that might fall due on the bond.

Appellee testified that he did not know Nicholls well enough to accept what he said about the matter, but that he had known Halsell for years, knew him in his official capacity with the bank, and went to him and told him what Nicholls said, and that Halsell verified Nicholls' statement, and that he believed what Halsell said and acted upon it and executed the notes. He testified that, had he known that there was no cash deposit to the credit of the board of governors' fund he would not have agreed to buy the bond and would not have executed the notes; that the first knowledge that he had that there was no cash deposit to the credit of said fund and that the syndicate had no cash to its credit in said bank was when Mr. Long, representing the commissioner of banking, appellant, had taken the bank over and called upon him to pay the notes, and in-

formed him that there was no cash deposit to the credit of said board of governors' fund. Halsell did not testify.

The notes were immediately after their execution indorsed by Nicholls, acting for the syndicate, and delivered to the bank. At the time there was no cash in the bank to the credit of the board of governors' fund, and in fact never had been, nor was there any money to the credit of the syndicate. Instead of placing said cash to the credit of the board of governors' fund, the bank issued deposit certificates therefor, some of them payable as distant as two years. The bank closed its doors a little less than thirty days after the notes were executed. The bond supposed to have been bought by appellee was not delivered to him when he executed and delivered the notes to Nicholls, but was tendered to him some six months after the bank closed, and after three of the notes had fallen due, when he refused to accept same. While the negotiations between Nicholls and appellee relative to sale of the bond and the execution of the notes were pending, appellee made extensive inquiry and investigation as to the status and reliability of the syndicate, and was advised, even by the commissioner of banking, that it was good, but later he stopped its doing business in Texas. When appellant took charge of the failed bank, he found the notes in question among its assets, and demanded payment, and appellee refused to pay, advising appellant as to the manner in which the execution of the notes was procured. This suit followed.

We think the facts without dispute show that the consideration for the notes had failed. The bond purchased by appellee was not delivered to him at the time the notes were executed. It was not even tendered to him until long after the bank had failed and after three of the notes had become due. The statement of the syndicate that there was on deposit in cash in the bank the sum of $700 to the credit of the board of governors' fund out of which the notes would be paid as they fell due was not true. The statement of the bank official that such cash was then on deposit for said purpose was not true. It was in consideration of and the belief in and the reliance upon the truth of said representations that appellee executed the notes. The statements to appellee to induce him to execute the notes, made by both the syndicate and the bank, were false and a fraud upon appellee which operated to his injury, and vitiated the whole transaction. But for the statements of facts which did not exist, and which were known not to exist, made by the syndicate and the bank to appellee, he would not have agreed to buy the bond, nor have executed the notes. The appellant stands in the shoes of the bank. He is but attempting to enforce the

rights of the bank to payment of the notes. He has no greater right than the bank had. If this were a suit by the bank to enforce payment of the notes, there is no doubt that it could not prevail, for it could not take advantage of its own wrong in inducing appellee to execute the notes by stating facts to him that it knew did not exist and which it knew were the inducing cause to move appellee to execute the notes. 20 Tex. Jur. § 7, p. 15. It is clear .that the bank was acting with Nicholls, agent' of the syndicate, in making the false and misleading statements to appellee, stated above, to induce him to execute the notes, and so it would be estopped to maintain suit on the notes, and appellant, not being in any better situation, cannot maintain the action.

The judgment is affirmed.